## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BERNARD MIMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-7780 |
| | ) | |
| CHICAGO POLICE OFFICERS KENNETH | ) | Honorable Judge Charles R. |
| BOUDREAU, #20435, RICHARD PECK, | ) | Norgle, Sr., Presiding |
| ROBERT MONTGOMERY, DANIEL MCNALLY, | ) | |
| #21135, TED PRZEPIORA, #20151, MICHAEL | ) | |
| MCDERMOTT, #20364, RAYMOND KAMINSKI, | ) | |
| #20822, JEAN ROMIC, #20333, JOHN CLISHAM, | ) | |
| #20600, and THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff BERNARD MIMS, by and through his attorneys, Kathleen T. Zellner & Associates, P.C., complains of Defendants, CHICAGO POLICE OFFICERS KENNETH BOUDREAU, RICHARD PECK, ROBERT MONTGOMERY, DANIEL MCNALLY, TED PRZEPIORA, MICHAEL MCDERMOTT, RAYMOND KAMINSKI, JEAN ROMIC, JOHN CLISHAM, and THE CITY OF CHICAGO, and alleges as follows:

### Jurisdiction and Venue

1. This action is brought under 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and under Illinois state law.

1

2. This Court has original jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction of Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

3. This Court also has original jurisdiction of Plaintiff's state-law claims pursuant to 28 U.S.C. § 1332, as Plaintiff is a citizen of the state of Minnesota, no Defendant is a citizen of the state of Minnesota, and the amount in controversy exceeds $75,000.00.

4. Venue is proper under 28 U.S.C. § 1391(b) as, on information and belief, Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## The Parties

5. Plaintiff Bernard Mims ("Plaintiff") is a resident and citizen of the state of Minnesota.

6. On information and belief, Defendant Kenneth Boudreau ("Defendant Boudreau") is a citizen of the state of Illinois.

7. On information and belief, Defendant Richard Peck ("Defendant Peck") is a citizen of the state of Illinois.

8. On information and belief, Defendant Robert Montgomery ("Defendant Montgomery") is a citizen of the state of Illinois.

9. On information and belief, Defendant Daniel McNally ("Defendant McNally") is a citizen of the state of Illinois.

10.     On information and belief, Defendant Ted Przepiora ("Defendant Przepiora") is a citizen of the state of Illinois.

11.     On information and belief, Defendant Michael McDermott ("Defendant McDermott") is a citizen of the state of Illinois.

12.     On information and belief, Defendant Raymond Kaminski ("Defendant Kaminski") is a citizen of the State of Illinois.

13.     On information and belief, Defendant Jean Romic ("Defendant Romic") is a citizen of the State of Illinois.

14.     On information and belief, Defendant John Clisham ("Defendant Clisham") is a citizen of the State of Illinois.

15.     At all relevant times, the individual defendants (collectively "the Defendant Officers") were employed by the City of Chicago as police officers.

16.     At all relevant times, the Defendant Officers were acting under color of state law and in the course and scope of their employment with the City of Chicago.

17.     The Defendant Officers are named in their individual capacity.

18.     Defendant City of Chicago is a duly incorporated municipal corporation.  Defendant City of Chicago is liable for the wrongful acts and omissions of the Defendant Officers taken in the course and scope of their employment pursuant to the Defendant City of Chicago's statutory obligation to indemnify them.

3

## Factual Allegations

### *Introduction*

19.     The Defendant Officers engineered a case against Plaintiff for a murder they knew he did not commit.  They did so for the purpose of protecting confidential informants who were providing them with intelligence related to illegal gang activity.   To further their objective the Defendant Officers withheld exculpatory evidence, manipulated witnesses, and misdirected the investigation away from the individuals the Defendant Officers knew to be the likely perpetrators.  As a result, Plaintiff was prosecuted for a crime in which he had no involvement.

### *The Dispute between the Gangster Disciples and the Black Disciples*

20.     In the summer of 2000, the Gangster Disciples and the Black Disciples were involved in an escalating dispute related to drug trafficking.  This dispute resulted in multiple shootings and deaths.

21.     At that time, Kenneth "Bolo" Jones ("Jones") was a ranking member of the Gangster Disciples.  Jones was in charge of drug sales from 47th Street to State Street to Martin Luther King Drive.

22.     Jones' "territory" included the Rosenwald Building ("the Rosenwald") located at 54 East 47th Street in Chicago, Illinois.

23.     The Black Disciples also sought to exert control over the drug trade at the Rosenwald, which caused conflict between the Black Disciples and the Gangster Disciples.

24.     Multiple shootings and homicides occurred as part of the conflict.

25.     Several of the shootings involved Jones.

26.     In June of 2000, Jones and several other Gangster Disciples were involved in a physical altercation with several Black Disciples.

27.     On or about July 2, 2000, Jones was shot several times.

28.     On or about August 28, 2000, Jones was again shot several times.

29.     Jones identified the shooter in at least one of the altercations as Melvin Richardson ("Richardson"), also known as "Dirty Red." Richardson was a known member of the Black Disciples.

30.     On information and belief, Richardson was arrested for the shooting, but charges were not approved.

31.     All of the Defendant Officers were aware of the ongoing dispute between the Black Disciples and the Gangster Disciples, that Kenneth Jones was a member of the Gangster Disciples, the shootings of Jones, and the fact that Jones had identified Richardson as the perpetrator in one of the shootings.

32.     No evidence ever suggested that Plaintiff was involved in any of the prior shootings involving Jones.

### Melvin Richardson's and Michael Sardis' Status as Confidential Informants

33.     For years, the Chicago Police Department has used confidential informants as a source of information of criminal gang activity.

34.    As it relates to gang activity, including homicides, confidential informants are a valuable tool for law enforcement because eyewitnesses are often fearful and/or intimidated into not identifying the perpetrator(s).

35.    At least as of 2000, Melvin Richardson was a confidential informant used by the Chicago Police Department as a source of intelligence of illegal activity perpetrated by the Black Disciples.

36.    For several years prior and including 2000, Michael Sardis ("Sardis"), also known as "Mike-Mike," was a member of the Black Disciples.

37.    On information and belief, Sardis acted as a confidential informant in multiple homicide investigations throughout the 1990s, and continued to act in that capacity at all times relevant to this Complaint.

### The Murder of Dwayne Baker

38.    Shortly after midnight on October 12, 2000, Kenneth Jones arrived at the Rosenwald.

39.    Jones entered through the main entrance of the building and proceeded into the building's courtyard.

40.    Dwayne Baker ("Baker"), Edward Ross ("Ross"), and Darrell Garrett ("Garrett") – all correctional officers employed by the Cook County Sheriff's Office – worked part time as security officers at the Rosenwald.

41.    Baker and Ross were on duty that evening.  Garrett – who was not working – went to the building to spend time with Baker and Ross.

42.     As Jones entered the Rosenwald, he observed Baker, Ross, and Garrett standing by Baker's vehicle in front of the Rosenwald.

43.     Baker and Jones were similar in appearance and stature.

44.     A short time after Jones entered the Rosenwald, a gold or tan-colored SUV pulled into the gas station at the corner of East 47th Street and South Michigan, across the street from the Rosenwald.

45.     An individual exited the SUV and started firing an assault-type rifle towards the front of the Rosenwald.

46.     Baker was struck and killed.

47.     Another person at the scene – Catrice Davis – suffered a gunshot wound to her calf.

48.     The perpetrator reentered the SUV and the vehicle fled the scene.

### *Initial Investigation*

49.     All of the Defendant Officers participated in the investigation of the shooting.

50.     Defendant Romic was assigned as the lead investigator.

51.     Several witnesses were interviewed at the scene.

52.     The witnesses consistently informed police that the SUV from which the shooter emerged was parked at the gas station across 47th Street, and that the SUV was pointed north, facing the front of the Rosenwald.

53.     Darrell Garrett told police that he was about to get into Baker's vehicle when he heard gunshots.

7

54.     Garrett went to the front of his truck by the engine block to take cover. Garrett looked over the hood of his vehicle.  He told police that he observed the offender firing an assault-type weapon from the hip.  The weapon looked like an M16-type rifle and had a banana clip in it.

55.     Garrett told police that the offender was shooting from the driver's side of the SUV.

56.     Garrett observed the offender jump back into the SUV, which then took off westbound on 47th Street.

57.     Garrett then saw a barrel sticking out of the front window on the passenger side of the SUV.

58.     Joseph Williams ("Williams") was interviewed by police at the scene and gave a detailed description of the events surrounding the shooting.

59.     Williams told police that he exited the gas station and was walking north across 47th Street.

60.     Williams observed a U-Haul truck parked parallel to 47th Street along the north side of the gas station lot, across from the gas pumps.

61.     Williams saw the gold-colored SUV drive between the pumps and the U-Haul, and then park facing north toward the Rosenwald.

62.     Williams then witnessed an individual exit the vehicle with a military-type rifle.  The individual began to fire shots towards the Rosenwald.

63.     Williams told police that he ran to the back of the U-Haul and climbed on the back of it so that the offender could not shoot at his feet under the truck.

8

64.    After the shots stopped, Williams observed the SUV drive westbound on 47th Street.

65.    Williams described the shooter as being male, black, approximately 25-28 years old, 5'9" – 5'11," medium complexion with a full beard, sideburns, and a mustache.

66.    Ronald Parker ("Parker) was also interviewed at the scene.

67.    Parker informed police that he saw Kenneth Jones enter the Rosenwald shortly before the shooting.

68.    Based on the circumstances of the shooting, including the fact that Jones and Baker were similar in appearance, police developed a working theory that members of the Black Disciples perpetrated the shooting under the mistaken belief that Baker was Jones.

### *The Defendant Officers Ignore Credible Evidence that Melvin Richardson was Involved in the Shooting*

69.    On October 13, 2000, Defendant Clisham interviewed Jones.

70.    Jones informed Defendant Clisham that he had been shot on two prior occasions, and that the perpetrator of at least one of the shootings was Melvin Richardson.

71.    All of the Defendant Officers were aware of the information provided by Jones.

72.    Despite the fact that Richardson had shot Jones on at least one prior occasion, the Defendant Officers never interviewed Richardson concerning his possible involvement in the shooting of Baker.

9

73. On information and belief, the Defendant Officers never showed Garrett, Williams, or any other eyewitness a photo array including Richardson's photograph.

74. The Defendant Officers never pursued Richardson as a suspect because he was an active informant in the Chicago Police Department's continuing investigation of the Black Disciples, and the Defendant Officers did not want to jeopardize a source of intelligence.

### *The Defendant Officers Receive Evidence that Taboo McNeal was Involved in the Shooting*

75. On January 10 and 11, 2001, Defendants Boudreau, Peck, and Montgomery interviewed Dan Thomas ("Thomas"), a member of the Black Disciples.

76. Thomas told Defendants Boudreau, Peck, and Montgomery that in October and December of 2000, Thomas learned that Taboo McNeal ("McNeal") "killed a policeman at the Rosenwald building."

77. Thomas further informed them that Donald Gardner, a known high-ranking member of the Black Disciples, ordered McNeal to run "security" at the Rosenwald. Running "security" includes keeping members of the Gangster Disciples out of the area.

78. Thomas further informed Defendants Boudreau, Peck, and Montgomery that McNeal, after shooting the policeman, fled the area in an SUV.

79. This information was consistent with the shooting as described by witnesses at the scene, as well as the police's theory as to the motive for the shooting.

10

80.    The information provided by Thomas was known to all of the Defendant Officers.

***The Defendant Officers Ignore Credible Evidence that Michael Sardis was the Shooter***

81.    On February 20, 2001, Defendant McNally interviewed Melvin Richardson, pursuant to Richardson's status as an informant.

82.    Richardson told Defendant McNally that he had a conversation with Michael Sardin in December of 2000.

83.    During that conversation, Sardin told Richardson that a few months prior, he, McNeal, and Dwayne Chester ("Chester") drove in a truck to the Rosenwald to "air those [expletive] out," which meant to shoot up Gangster Disciples.

84.    Sardin claimed that Chester filed the actual shots.

85.    However, on information and belief, Sardin fit the description of the shooter provided by Joseph Williams.

86.    Defendants knew Sardin and Chester were Black Disciples.

87.    Again, this information was consistent with the police's theory that Baker was shot by Black Disciples because he was mistaken for Jones.

88.    The information provided by Richardson was also consistent with the information provided by Thomas to Defendants concerning McNeal's involvement in the shooting.

89.    The information provided by Richardson was known to all Defendants.

11

90. Defendants deemed the information provided by Richardson to be credible, but they did not pursue it.

91. Defendants never made any attempt to interview Sardis concerning his involvement in the shooting.

92. On information and belief, the Defendant Officers never showed Garrett, Williams, or any other eyewitness a photo array including Sardis' photograph.

93. The Defendant Officers never pursued Sardis as a suspect because he was an active informant in the Chicago Police Department's continuing investigation of the Black Disciples, and the Defendant Officers did not want to jeopardize a source of intelligence.

### The Defendant Officers' Motive to Frame Plaintiff

94. Rather than pursue credible information that Melvin Richardson, Michael Sardis, Taboo McNeal, and Dwayne Chester perpetrated the shooting, the Defendant Officers devised a scheme to falsely implicate Plaintiff.

95. Prior to June 4, 2001, there was no evidence to suggest that Plaintiff was involved in the Baker homicide.

96. In fact, Plaintiff did not fit the description of the shooter provided by eyewitnesses at the scene.

97. Plaintiff was known to police in the Area, however, based on a prior encounters Plaintiff had with them.

12

98.     In one instance, on July 27, 2000, Plaintiff was confronted at gunpoint by police officers outside of the building located at 4555 South Federal in Chicago, Illinois.

99.     At that time, Plaintiff was not committing any crime.  Rather, he was simply sitting outside the building, speaking with friends.

100.    Two of the police officers escorted Plaintiff into the building.  The officers smashed and disabled lights in the hallway, and proceeded to punch, kick, and beat Plaintiff.

101.    Plaintiff cried out for help.  However, another officer prevented residents from entering the hallway and intervening.

102.    As a result of the beating, Plaintiff suffered physical injuries including a fractured jaw that required a metal plate to be inserted.

103.    Plaintiff subsequently filed a lawsuit against several police officers for excessive force which was later resolved by a settlement agreement.

104.    As a result of these and other encounters, the Defendant Officers disliked Plaintiff and endeavored to find a reason to arrest him.

### *The Defendant Officers Obtain an Unreliable, Incredible Identification of Plaintiff from Thomasina McKee*

105.    Prior to June 4, 2001, there was no reason to believe that Thomasina McKee ("McKee") had information about the Baker homicide or that she was present at the scene when Baker was killed.

106.    On June 4, 2001, Defendants Przepiora and McDermott picked McKee up from her place of work and transported her to Area One.

107. Before taking her to the Area, Defendants Przepiora and McDermott did not tell McKee why she was being taken to the station.

108. McKee thought that she was being transported to the Area because she believed that she had an open warrant.

109. During the course of the interview, Defendants Przepiora and McDermott suggested to McKee that Plaintiff committed the shooting, despite having no evidence to support that assertion.

110. During the course of the interview, Defendants Przepiora and McDermott showed McKee a photograph of Plaintiff, who McKee knew as "Bern."

111. McKee then told Defendants Przepiora and McDermott that at the time of the shooting she was sitting in a parked vehicle on East 47th Street with Erma Jones and a girl she knew as Danielle.

112. McKee told Defendants Przepiora and McDermott that the vehicle was parked along the north side of the street, facing west.

113. McKee further stated that she was parked about thirty feet from the northwest corner of 47th Street and Michigan.

114. McKee told Defendants Przepiora and McDermott that after hearing shots, she purportedly observed the gold-colored SUV parked in the northwest corner of the gas station lot, next to a pay phone.

115. According to McKee, she observed the shooter on the rear passenger side of the SUV, armed with a rifle.

116. McKee identified Plaintiff as the shooter.

14

117.    Defendants Przepiora and McDermott knew that McKee's identification of Plaintiff as the shooter was unreliable and incredible.

118.    Plaintiff did not fit the description of the shooter provided by Joseph Williams, in that Plaintiff has a light complexion and was clean-shaven at the time of the shooting.

119.    McKee's purported observations of Plaintiff as firing shots from the passenger side of the vehicle conflicted with what Garrett told police at the scene.

120.    Most importantly, Defendants Przepiora and McDermott knew that from where McKee told them she was positioned, she would not be able to see through the U-Haul and the SUV to identify the shooter.

121.    Because Defendants Przepiora and McDermott did not believe McKee's identification to be credible, they did not prepare a supplemental report concerning the interview for more than two-and-a-half years.

122.    Defendants Przepiora and McDermott did not contact felony review or prepare a written statement to memorialize McKee's purported identification of Plaintiff as the alleged shooter.

123.    For more than two-and-a-half years, the Defendant Officers did not follow up with Garrett or Williams to show them a photo array with Plaintiff's photograph to determine whether they could identify him as the shooter.

124.    For more than two-and-a-half years, the Defendant Officers did not interview Erma Jones or Danielle to corroborate McKee's story.

125.    Again, they did not do so because they knew it to be false.

***The Defendant Officers Attempt to Advance their Efforts to Falsely
Implicate Plaintiff through Tashundra Crafton***

126.    On September 18, 2001, Defendant Przepiora interviewed Tashundra
Crafton ("Crafton").

127.    As with McKee, prior to Crafton's interview there was no reason to
believe that Crafton had information about the Baker homicide or that she was
present at the scene when Baker was killed.

128.    The only explanation for Defendant Przepiora's pursuit of Crafton as a
witness is to use her to fabricate evidence against Plaintiff.

129.    During the course of the interview, Defendant Przepiora suggested to
Crafton that Plaintiff committed the shooting, again despite having no evidence to
support that assertion.

130.    During the course of the interview, Defendant Przepiora showed
Crafton a single photograph of Plaintiff, who Crafton also knew as "Bern."

131.    Crafton proceeded to tell Defendant Przepiora that she was on a CTA
bus headed eastbound on 47th Street at the time of the shooting.

132.    According to Crafton, she heard shots and observed Plaintiff standing
in the middle of 47th Street, armed with an AK-47 type weapon, firing shots towards
the front of the Rosenwald.

133.    Incredibly, Crafton told Defendant Przepiora that the bus continued on
through the area of the shooting, and that she observed Plaintiff place the weapon
in the front seat of a gold SUV, parked between two U-Haul trucks.

134.   Defendant Przepiora knew Crafton's identification of Plaintiff to be utterly worthless, based on the incredible nature of her story, the fact that no other witness observed a CTA bus on 47th Street at the time of the shooting, and because Crafton's description of Plaintiff was inconsistent with Plaintiff's appearance.

135.   Defendant Przepiora thought so little of the information provided by Crafton that he did not prepare a supplemental report reflecting the interview for more than two years.

136.   Defendant Przepiora did not endeavor to verify Crafton's claim that a CTA bus was on 47th Street at the time of the shooting by, for example, contacting any of the drivers along that route.

137.   Defendant Przepiora did not do so because he knew Crafton's story to be false.

### *The Defendant Officers Fabricate Evidence to Support a Case Against Plaintiff*

138.   By November 12, 2003, the Defendant Officers were no closer to solving the Baker homicide.

139.   The Defendant Officers knew that Taboo McNeal was involved in the shooting.  However, they did not want to compromise their informants, Melvin Richardson and Michael Sardin, by arresting McNeal without some other source of evidence as to McNeal's involvement.

140.   The Defendant Officers therefore devised a scheme to charge Plaintiff with the shooting, intending to pressure him into flipping on McNeal.

141.    On November 12, 2003, Defendants Przepiora and Kaminski re-interviewed McKee and obtained the same incredible, unreliable identification of Plaintiff as they had in June of 2001.

### The Defendant Officers Fabricate Wallace Fields' Identification of Plaintiff as the Shooter

142.    Wallace Fields ("Fields") was interviewed at the scene shortly after Baker was shot.

143.    When Fields was first interviewed, he informed police that he was standing on 47th Street at the time of the shooting, and that he was able to observe the shooter

144.    Per Fields, the shooter walked all the way across 47th Street up to Baker, and shot Baker while he was lying on the ground.

145.    No other witness observed the shooter approach Baker as Fields originally told police.

146.    Fields claimed that he would be able to identify the shooter because he had seen him before, although he did not know the shooter's name or nickname.

147.    On March 22, 2004, Defendants Przepiora and Kaminski re-interviewed Fields.

148.    At that time Defendants Przepiora and Kaminski knew that Fields was an unreliable witness based on the fact that what he claimed to observed was contradicted by every other eyewitness at the scene.

149.    Defendants Przepiora and Kaminski told Fields that McKee and Crafton had identified Plaintiff as the shooter.

18

150.    Defendants Przepiora and Kaminski showed Fields the same photograph of Plaintiff that they had previously shown McKee.

151.    Fields told Przepiora and Kaminski that he had never seen Plaintiff before.

152.    Defendants Przepiora and Kaminski coerced Fields sign the back of Plaintiff's photograph, next to McKee's signature.

153.    Defendants Przepiora and Kaminski knew that Fields' putative identification of Plaintiff was false.

154.    Defendants engineered the false identification of Plaintiff to bolster what they otherwise knew to be an incredible identification of Plaintiff made by Thomasina McKee.

### *The Defendant Officers Fabricate a Prior Identification of Plaintiff by Thomasina McKee*

155.    On June 25, 2004, Defendant Przepiora re-interviewed Kenneth Jones.

156.    In order to bolster McKee's incredible identification of Plaintiff, Defendant Przepiora coerced Jones into fabricating a story that McKee had told Jones shortly after the shooting that she witnessed the shooting and that Plaintiff was the shooter.

157.    Defendant Przepiora knew this claim to be completely false.  McKee never told Jones that Plaintiff was the shooter.  The conversation concocted by Defendant Przepiora never occurred.

19

***The Defendant Officers Initiate Charges Against Plaintiff Without
Probable Cause***

158.  On July 7, 2004, Defendants Przepiora and Kaminski caused Plaintiff
to be arrested.

159.  Defendants Przepiora, Kaminski, and Boudreau questioned Plaintiff.

160.  Defendants Przepiora, Kaminski, and Boudreau told Plaintiff that they
knew he did not commit the shooting, but claimed that he knew who had.

161.  Defendants Przepiora, Kaminski, and Boudreau showed Plaintiff
several photographs, including a photograph of Taboo McNeal.

162.  Defendants Przepiora, Kaminski, and Boudreau threatened Plaintiff
that if he did not give them information that McNeal was involved in the shooting,
that he would spend the rest of his life in prison.

163.  Plaintiff told Defendants Przepiora, Kaminski, and Boudreau that he
did not have any involvement in the shooting, and that he did not have any
information about the perpetrators.

164.  Because Plaintiff could not give them any information, Defendants
Przepiora, Kaminski, and Boudreau requested that assistant state's attorney
Charles Brinkman approve charges against Plaintiff.

165.  In doing so Defendants Przepiora, Kaminski, and Boudreau misled the
assistant state's attorney by (1) withholding from him Michael Sardis' admission
that he, Taboo McNeal, and Dwayne Chester committed the shooting; (2)
withholding from him that McKee could not have seen the shooter from her vantage
point on 47th Street; (3) withholding from him the fact that the Defendant Officers

suggested to McKee that Plaintiff was the shooter prior to her identification of him; (4) withholding from him the fact that Field's putative identification of Plaintiff was fabricated; and (5) withholding from him the fact that Jones' statements concerning McKee's identification of Plaintiff as the shooter shortly after the shooting were fabricated.

166. The assistant state's attorney approved first-degree and attempt murder charges against Plaintiff based on the fabricated evidence.

167. On the way into lockup, Defendant Przepiora "muffed" Plaintiff in the back of the head and told him something to the effect of, "You may just beat it, but you will spend forever in jail before you do."

### *Plaintiff's Trial, Conviction, and Subsequent Exoneration*

168. The Defendant Officers never disclosed to the prosecution or to the defense the status of Michael Sardis as an informant, or their true motivations for arresting Plaintiff for a crime they knew he did not commit.

169. The Defendant Officers never disclosed to the prosecution or to the defense the manner in which they fabricated evidence against Plaintiff.

170. On May 16, 2006, Plaintiff was convicted of first-degree murder and attempt murder based on the evidence fabricated by the Defendant Officers.

171. Defendant was subsequently sentenced to a total of 95 years in the Illinois Department of Corrections.

172. In 2015, the Cook County State's Attorney's Office ("the CCSAO") initiated a re-investigation of Plaintiff's conviction, based in part on the failure of

law enforcement to adequately investigate the involvement of Taboo McNeal, Michael Sardis, and Dwayne Chester in the shooting.

173.    On October 27, 2016, on the motion of the State, Plaintiff's conviction and sentence were vacated and the charges dismissed.

174.    Plaintiff subsequently filed a petition for a certificate of innocence. The State did not oppose the petition.  On November 10, 2016, the circuit court granted Plaintiff's petition, and he was awarded a certificate of innocence.

### *Plaintiff's Damages*

175.    As a direct and proximate result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Plaintiff was incarcerated 4,860 days for a crime he did not commit.

176.    As a further direct and proximate result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Plaintiff endured incalculable pain and suffering, severe mental anguish, emotional distress,  humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

177.    As a further direct and proximate result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and

22

omissions, Plaintiff endured the sub-standard medical care attendant the practical limitations of incarceration, and which is rampant within the Illinois Department of Corrections.

178.   In particular, beginning in about July of 2015, Plaintiff began to suffer extreme pain in his jaw associated with a plate that had been inserted to stabilize a left mandibular fracture.

179.   Plaintiff went months without any treatment and without seeing an off-site specialist.

180.   Plaintiff lost an extreme amount of weight.

181.   Plaintiff's pain was so bad that he began to hallucinate.

182.   Plaintiff contemplated suicide and was placed on suicide watch.

183.   It was not until May of 2016, almost 10 months after Plaintiff first experiencing pain, that he was shipped to see an oral surgeon.  However, that oral surgeon lacked the equipment and expertise necessary to address the pain caused by the plate in Plaintiff's jaw.

184.   Plaintiff continued to suffer extreme pain, swelling, and muscle tightness in his jaw.

185.   Plaintiff was placed on a liquid diet.  At times he was given over-the-counter, largely ineffective pain medication, and at other times he was simply ignored.

186. It was not until October 26, 2016, the day before his release, that Plaintiff finally underwent surgery at UIC Medical Center. The plate was removed and Plaintiff's pain was finally alleviated.

187. The foregoing is just one of countless examples of the horrors to which Plaintiff was subjected as a result of Defendants' unconstitutional misconduct.

## Causes of Action

### COUNT I

### 42 U.S.C. § 1983 – 14th Amendment Due Process
### Destruction and/or Concealment of Material Evidence

188. Each paragraph of this Complaint is incorporated as if restated fully herein.

189. In the manner described above and alleged herein, the Defendant Officers concealed and/or destroyed material exculpatory and impeachment evidence from Plaintiff and from prosecutors before, during, and after Plaintiff's criminal trial, causing the prosecution against Plaintiff to commence and continue for more than 13 years.

190. In concealing and/or destroying the material exculpatory and impeachment evidence, the Defendant Officers acted maliciously, intentionally, and with willful and wanton disregard for Plaintiff's constitutional rights.

191. The Defendant Officers' actions directly and proximately caused the injuries and damages to Plaintiff as claimed above, and constitute a due process violation under the 14th Amendment of the United States Constitution.

24

## COUNT II

### 42 U.S.C. § 1983 – 14th Amendment Due Process
### Fabrication of Evidence

192.   Each paragraph of this Complaint is incorporated as if restated fully herein.

193.   In the manner described above and alleged herein, the Defendant Officers fabricated and solicited false evidence, including witness identifications, witness statements and stories, police reports, and physical evidence they knew to be false.

194.   As a result of knowingly fabricating and soliciting false evidence, Defendant Officers knew or should have known that Plaintiff was innocent.

195.   The Defendant Officers continued their investigation of Plaintiff despite knowing or having should have known Plaintiff was clearly innocent.

196.   The Defendant Officers further used investigative techniques that were so improper that they knew or should known that those techniques would yield false information.

197.   The evidence fabricated by Defendant Officers was used at trial to secure Plaintiff's unjust and wrongful conviction.

198.   The Defendant Officers' misconduct directly resulted in the criminal conviction of Plaintiff, thereby denying his constitutional due process rights guaranteed by the 5th and 14th Amendments.   Absent this misconduct the prosecution of Plaintiff could not have and would not have been pursued, much less resulted in a conviction.

25

199.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with a willful indifference to Plaintiff's constitutional rights.

200.   The Defendant Officers' actions directly and proximately caused the injuries and damages to Plaintiff as claimed above, and constitute due process violations under the 14th Amendment of the United States Constitution.

## COUNT III

### 42 U.S.C. § 1983 – 14th Amendment Due Process
### Failure to Intervene

201.   Each paragraph of this Complaint is incorporated as if restated fully herein.

202.   In the manner described above and alleged herein, during the constitutional violations described above, the Defendant Officers stood by without intervening to prevent the misconduct, including but not limited to, the concealment and/or destruction of material exculpatory and impeachment evidence, and the deliberate fabrication of false evidence that caused Plaintiff's charges and conviction.

203.   The Defendant Officers had a reasonable opportunity to prevent this harm, but failed to do so.

204.   As a result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress.

26

205. The misconduct described in this Count was objectively unreasonable and was undertaken with malice and willful indifference to Plaintiff's constitutional rights.

206. Defendant Officers' actions directly and proximately caused the injuries and damages to Plaintiff as claimed above, and constitute due process violations under the 14th Amendment of the United States Constitution.

## COUNT IV

### 42 U.S.C. § 1983 – 14th Amendment Due Process
### Conspiracy to Deprive Constitutional Rights

207. Each paragraph of this Complaint is incorporated as if restated fully herein.

208. In the manner described above and alleged herein, the Defendant Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deprive Plaintiff of exculpatory and impeachment information to which he was lawfully entitled and which would have led to either his not being charged, his acquittal, or his more timely exoneration.

209. In the manner described above and alleged herein, the Defendant Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deliberately fabricate false evidence against Plaintiff when they knew or should have known he was innocent, resulting in violations of Plaintiff's due process rights.

27

210.    The Defendant Officers, acting in concert among and between themselves and with unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

211.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to arresting Plaintiff without probable cause, fabricating and improperly suggesting identification evidence, withholding material exculpatory and impeachment evidence, and committing perjury during hearings and trials.

212.    The misconduct described in this count was undertaken with malice, willfulness, and/or reckless indifference to Plaintiff's constitutional rights.

213.    Said conspiracy and overt acts were continued from on or about January 1, 2001 through the date of Plaintiff's conviction and sentence.

## COUNT V

### Illinois State Law
### Malicious Prosecution

214.    Each paragraph of this Complaint is incorporated as if restated fully herein.

215.    In the manner described above and alleged herein, the Defendant Officers knowingly and maliciously initiated and/or caused judicial proceedings to continue against Plaintiff knowing they lacked probable cause to do so.

216.    Defendants created false or incomplete police reports and/or made false and/or incomplete statements to other police officers, the prosecutors, and in court regarding the criminal investigation in this matter.

28

217.    Defendants instituted the judicial proceedings and/or caused them to continue against Plaintiff with malice, and with willful and wanton disregard for the truth of the allegations asserted against Plaintiff.

218.    This prosecution was terminated in Plaintiff's favor on October 27, 2016, when his convictions and sentence were vacated and all charges were dropped.    That the termination of proceedings is indicative of innocence is demonstrated by the certificate of innocence issued to Plaintiff on November 10, 2016.

219.    Defendants are liable for the prosecution because it was proximately caused by their unlawful actions as set forth above.

220.    These actions directly and proximately caused the injuries and damages to Plaintiff as claimed above and constitute the tort of malicious prosecution under Illinois law.

## COUNT VI

### Illinois State Law
### Indemnification

221.    Defendant City of Chicago was the employer of each of the Defendant Police Officers at all times relevant to this complaint, as set forth above.

222.    All of the individually named Defendant Officers were at all relevant times acting within the course and scope of their employment.

223.    Pursuant to 745 ILCS 10/9-102, the governmental entity set forth above is liable to pay all judgments and settlements entered against each of its employees for the claims set forth above.

## COUNT VII

### Illinois State Law
### Respondeat Superior

224.    Each paragraph of this Complaint is incorporated as if restated fully herein.

225.    At all times relevant to this complaint the Defendant Officers acted as agents of, and in the scope of their employment with, Defendant City of Chicago.

226.    Defendant City of Chicago is liable for the torts of the Defendant Officers for their violations of state law under the doctrine of *respondeat superior*.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against all Defendants, awarding compensatory damages, attorneys' fees, and costs against Defendants, as well as punitive damages against the individually-named Defendants, as well as any other relief this Court deems just and appropriate.

## **Jury Demand**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Kathleen T. Zellner
Kathleen T. Zellner
Attorney for Plaintiff
Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois  60515
Phone:  630-955-1212
Fax:  630-955-1111
Email:  kathleen.zellner@gmail.com